No. 68,330

STATE OF KANSAS, *Appellee,* v. CURTIS COLEMAN, *Appellant.*

(856 P.2d 121)

Opinion filed July 9, 1993.

*M. Kristine Paredes,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Curtis Coleman, from his conviction of second-degree murder.

Two issues are presented on appeal. The first issue involves the trial court's refusal to allow the testimony of three witnesses who had not been endorsed by defense counsel prior to their being called to the stand. The unlisted witnesses' testimony in part would have been that Curtis Taylor, not the defendant, shot and killed Tyrone Germany.

The second issue is whether the trial court erred in failing to instruct the jury on involuntary manslaughter and voluntary manslaughter as lesser included offenses to the charge of second-degree murder.

Tyrone Germany, the decedent, was shot in front of the residence where his girlfriend, Lashonda Gooley, and her two children live. Lashonda has several siblings, including Albert "Donny" Taylor and Curtis Taylor.

Connie Coleman lives across the street from Lashonda. Connie is the aunt of the defendant. She has a daughter, Elizabeth Coleman, who lives down the street. Mackler "Buck" Nunally resides with Elizabeth and their two children. Elizabeth was expecting a child by Curtis Taylor.

Most of the witnesses know each other and live in the same neighborhood. For example, Elizabeth Coleman, Buck Nunally, the defendant, Donny Taylor, and Curtis Taylor grew up together and live in the projects in Wyandotte County. Curtis Taylor had known the decedent since 1985. The defendant, however, had met the decedent only two or three weeks prior to the shooting.

The events precipitating the shooting of the decedent began at the home of Elizabeth Coleman. The decedent drove Curtis Taylor to Elizabeth Coleman's residence on a hot summer evening in July of 1991. Curtis Taylor testified he went over to Elizabeth's to talk about going to visit the doctor because she had called him earlier in the day and asked him to accompany her. Elizabeth testified she had not called Curtis Taylor that day, although she previously had asked him to take her to the doctor. She said that earlier in the day Buck had been "playing" with her and said he was "going to knock the baby out [of her] stomach" and that her

sister had relayed Buck's comment to Curtis Taylor. Upon his arrival, Curtis Taylor said Buck cursed and threatened him. The witnesses agree a physical fight erupted between the two men, with Curtis Taylor hitting Buck five or six times and Buck hitting Curtis Taylor once. Buck is a small man, weighing about 98 pounds. The decedent never threatened anyone nor did he become involved in the fight.

Buck testified Curtis Taylor put a .38 caliber gun to Buck's head. Buck added that although Curtis Taylor turned the gun over to the decedent, Curtis Taylor retrieved it and fired it into the air three times. Curtis Taylor acknowledged pulling a .38 caliber Smith and Wesson revolver from his pocket, but said he did not point it at Buck and gave the gun to the decedent, who put it in the trunk of his car. Afterwards, Buck filed a police report on the incident.

Although the witnesses' accounts vary on how it happened, all agree that, as a result of the altercation between Buck and Curtis Taylor, Elizabeth Coleman ended up with a bleeding head injury. Unbeknownst to Buck, Elizabeth left with Curtis Taylor and the decedent. They stopped briefly at the decedent's house, and then Curtis Taylor and the decedent took Elizabeth to where her mother, Connie Coleman, lived. She stayed a few minutes and then went to one of her sisters' houses before returning home.

Curtis Taylor testified he saw the defendant at Connie's place and they talked about what happened to Elizabeth. According to Curtis Taylor, the defendant said he was not taking sides, but he also was not going to let either Curtis Taylor or Buck hurt Elizabeth and then asked Curtis Taylor not to hurt her. Curtis Taylor stated the decedent took his gun and returned it when the conversation was finished, at which point Curtis Taylor and the decedent walked across the street to Lashonda's, where Donny was sitting on the porch. Curtis Taylor said that although Donny had a .25 caliber automatic, he did not have the gun with him at that time. According to Curtis Taylor, he went home about 30-40 minutes later and remained there until after he learned of the decedent's death. Curtis Taylor testified that he did not shoot the decedent and that he was not present when the decedent was shot.

Buck testified he went for a walk after everyone left—he was frustrated and angry. He eventually met up with the defendant and informed the defendant that Curtis Taylor and the decedent had harassed him with a gun at Elizabeth's place.

After the parties to this story moved from place to place and consumed beer, a man named "Black" gave the defendant a small black automatic handgun to give to Buck. The defendant gave Buck the handgun.

When they were at Elizabeth's, Buck showed the defendant the blood from where "they" had beaten him. Elizabeth kicked Buck out of the house. Buck and the defendant parted company, and Buck walked up the street to Connie Coleman's house. That sets the stage for Tyrone Germany's death. The witnesses' description of what occurred is conflicting and somewhat hard to follow.

<u>Defendant's Testimony</u>

The defendant observed Donny Taylor, Curtis Taylor, and the decedent leave Lashonda's yard and advance toward Buck. The defendant decided to attempt to convince Buck to leave the immediate area. As the defendant neared the men, who by that time were in the street, he heard Buck arguing with the decedent. Donny Taylor walked in front of the defendant and told the defendant he had nothing to do with this. The defendant responded that he wanted to get Buck out of there. When Donny said no, the defendant pushed him out of the way. The defendant perceived they were setting up for Curtis Taylor and the decedent to "jump on" Buck.

Buck pulled out a gun. The defendant asked Buck, "Why you jumping on Tyrone [Germany] when he's the one—Curtis [Taylor] is the one that did it?" The defendant then noticed Curtis Taylor was gone and did not see him again that night. Buck hit the decedent in the face with his hand. The defendant told Buck to give him the gun. The defendant and the decedent both reached for the gun and had a hold on it when the gun went off, hitting nothing. The gun fell to the street, and the defendant reached it first. Curtis Coleman heard two shots, ducked, then raised up, and saw the decedent was down. Donny Taylor was yelling, "Man, why did you do it? Man, you hit the wrong one," and

began breaking windows. The defendant gave the gun back to Buck, who took it and left. The defendant then moved Tyrone from the street to the sidewalk because of traffic and tried to resuscitate him.

When Lashonda came outside and asked what happened, the defendant told her the decedent had been shot. The defendant stayed until he saw the police cars arrive. He then walked to a friend's house and got a message to his sister to come pick him up. The defendant stayed at his sister's place for 10 to 20 minutes, had a couple of drinks, and then went to the police station. The defendant denied shooting the decedent.

### Mackler "Buck" Nunally's Testimony

When Buck was sitting on the bench in Connie's yard, he saw the decedent drive up, park his car, and walk into Lashonda's house. Buck took the gun out of his pocket and put it beside him on the bench. The defendant walked up and, when the decedent exited Lashonda's, asked Buck what the decedent had to do with the incident at Elizabeth's. Buck said, "He brought Curtis Taylor down to the house and they jumped on me and they passed each other the gun." The defendant was not angry, but was frustrated because Curtis Taylor and the decedent had jumped on Buck. The defendant then picked up the gun and shot once in the air.

As the decedent walked to his car, Buck saw Donny, but not Curtis Taylor. The defendant asked the decedent, "Why did you send your dog [Curtis Taylor] to my dog's [Buck's] house?" Tyrone responded that he did not have anything to do with it. Buck then hit the decedent in the face, and the decedent stumbled backwards three or four steps. The decedent had his hands at his side. Donny Taylor joined the fracas, and he and the defendant started arguing. The defendant pushed Donny aside and then hit the decedent, who fell across the curb by the sidewalk. On direct examination, Buck said that as the decedent attempted to stand up, the defendant turned and shot him. On cross-examination, Buck said that the defendant and the decedent struggled over the gun, that the decedent was knocked to the ground with his legs up between the defendant's legs, and that as the defendant turned, "the gun just went off." The defendant was about two

to three feet from the decedent when the gun went off. Buck perceived the shooting as accidental. Buck did not see anyone but the defendant with a gun. Buck acknowledged he actually did not see the gun at the time the decedent was shot—he heard the gunshot.

When the decedent was shot, Johnny "Archiemo" Rucker (the defendant's nephew) was present; Lashonda was in the doorway of her house; and Evelyn Coleman and Connie were on their respective porches. After the shooting, Donny Taylor began breaking windows and repeatedly hollered, "You shot the wrong one." Buck took the gun from the defendant and left the scene. Buck returned the gun to Black.

### Donny Taylor's Testimony

Donny Taylor was sleeping at Lashonda's house when she woke him up and said the decedent was being harassed. Donny went outside and saw the defendant and Buck arguing with the decedent. The defendant pulled out a .22 caliber pistol and pointed it at the decedent. Buck walked up to the decedent and hit him. Then the defendant hit the decedent, who fell toward the sidewalk. The defendant shot the decedent from a distance of two or three feet with a .22 caliber gun.

Lashonda was standing in the doorway when the shooting occurred. Donny yelled at the defendant that he shot the decedent for no reason and that it could have been avoided and then ran around and broke windows. Donny acknowledged owning a .25 caliber automatic, but said he did not have the gun with him at the time of the fatal shooting.

### Lashonda Gooley's Testimony

Prior to the shooting, the defendant was sitting on a bench in Connie's yard. Curtis Taylor was not present at the time of the shooting.

The defendant pushed the decedent to the ground. As the decedent started to get up, the defendant stood in front of him and from a distance of three feet shot the decedent in the head. The defendant used a small black handgun. Lashonda was 10 to 12 feet away when this happened and said she had no problem seeing because of the street light.

Other Witnesses' Testimony

Charlen Jones and her mother live across the street from Lashonda. Charlen and Lashonda are friends. Charlen dates one of the defendant's nephews. She was in bed when she heard the defendant yell at the decedent to get out of the car and show his face. After a shot was fired and the defendant continued to yell, Charlen looked out of her window and saw Donny standing between the defendant and the decedent. The defendant then pushed the decedent twice, and after he fell down, the defendant shot him with a small handgun. Charlen only heard two shots. She did not see a scuffle for the gun prior to the shooting. Charlen did not see Curtis Taylor during the argument or shooting.

Johnny "Archiemo" Rucker denied being present at the shooting.

Prior to the shooting, Connie Coleman saw Curtis Taylor, Donny Taylor, the decedent, Buck, and the defendant in the street by the light post. Connie heard the defendant tell "the boys that it don't take all [of] you to jump on Mack as little as he is." She did not witness the shooting because she was on the telephone. Connie heard one gunshot and went to the window. Lashonda was hollering, "Curtis [Coleman] done shot my man." Connie then saw the defendant attempt to revive the decedent while the other men ran off.

Evelyn Coleman, another of Connie's daughters, also lives across the street from Lashonda. Evelyn testified she was sitting on her porch with her boyfriend when she saw Buck hit the decedent. She saw Connie, Buck, and the defendant, but not Curtis Taylor. The defendant attempted to break up the fight between Buck and the decedent, and then the defendant and the decedent started fighting with both of them throwing punches. Evelyn heard a shot and saw the decedent fall. Evelyn ran over to decedent, declared he was dead, and told the defendant to leave. According to Evelyn, the defendant said, "I didn't shoot him. I ain't going." Evelyn did not see any weapons and heard only one shot; she did not know who fired it.

Regina Malone, another cousin of the defendant who lives in the neighborhood, testified. She saw the defendant and the decedent arguing. Regina subsequently heard three gunshots, which

she identified as two .22 shots ("a .22 pop is soft") and one .38 shot ("hard hit"). She ran to the door and saw the defendant trying to resuscitate the decedent. Regina heard Donny Taylor say the bullet was not meant for the decedent, but for the defendant. She claimed that earlier in the day, Donny Taylor had stopped by her place and asked for .22 bullets. On cross-examination by the prosecutor, Regina denied she earlier had told the police she was asleep at the time and did not hear any gunshots.

Of much importance to this case is the testimony of Daralynn Brown, who also lives in the neighborhood. She testified she observed the shooting from her porch. Brent Rogers and a person named Darrin were with her. Daralynn watched the decedent drive up, park his car across the street from Lashonda's, and exit the vehicle. Daralynn saw Curtis Taylor, Donny, Buck, and the defendant in the immediate vicinity. Curtis Taylor and Donny were standing behind the decedent. Daralynn observed a scuffle, heard two shots, and saw the decedent drop to the ground on his back. Curtis Taylor was the first one to leave the scene—he ran between the buildings and then up the hill behind Lashonda's house. Another man, whom Daralynn did not recognize, ran behind her building. Buck then left, walking down the street in front of her house. When Daralynn asked Buck what had happened, he just mumbled. The defendant stayed and attempted to revive the decedent while Donny was "stomping and carrying on" and then hollering and breaking windows. Daralynn heard Donny exclaim the bullet was meant for Curtis and assumed Donny meant the defendant because Curtis Taylor was Donny's brother. Donny also said he did not know why the shooter had done it because he had just been released from prison and now would be going back. Donny then took off running. Daralynn saw the defendant point either a gun or a finger at the decedent. On cross-examination, she acknowledged she had told the police the defendant had been waving a gun, but said in retrospect she was not sure if it had been a gun.

Curtis Taylor had been convicted of aggravated battery in October 1989, had served 18 months, and had been on parole for 10 months. At the court's hearing on the defendant's motion for a new trial, defense counsel mentioned that the State had given Curtis Taylor immunity.

When the police arrived at the crime scene, a crowd of at least 15 people had gathered. The police found a spent .38 caliber bullet near the curb and a shell casing of a lesser caliber than a .38 near the middle of the street. No weapons were recovered.

The pathologist who examined the decedent's body concluded he died from a gunshot wound to the head. A .22 caliber bullet was removed from the decedent's head. The pathologist determined that the decedent was shot from a distance of three to four feet and that the bullet entered his skull at a downward angle of 45 degrees. According to the pathologist, it was possible that someone facing the decedent shot him as he attempted to stand up.

A jury convicted the defendant of second-degree murder, and he was sentenced to a term of 15 years to life.

The defendant argues the trial court erred in refusing to allow three unendorsed defense witnesses to testify. As a result of this error, he claims his right to present witnesses on his own behalf, guaranteed by the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights, and his right to due process were violated. See *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989).

On the third day of trial, the defendant attempted to call Lucretia Egans as a witness. The State objected, arguing that it had not been notified the witness was to testify and that the pretrial discovery conference order specified the defense would provide the State with a list of defense witnesses and Lucretia's name was not on that list. Defense counsel explained he did not know about this witness until he arrived at the courthouse that morning. The source for the witness was the defendant's family. Defense counsel mentioned the State was welcome to visit with Lucretia Egans. Despite defense counsel's argument that to exclude the testimony was highly prejudicial to the defendant, the trial court ruled the pretrial order was binding. The court reasoned this was the kind of situation the pretrial order was meant to prevent—to surprise the State in this fashion put the State at a disadvantage.

On appeal, the defendant acknowledges Lucretia Egans' testimony was not proffered. He maintains, however, that because she was an eyewitness to the shooting, it cannot be said the

exclusion of her testimony was harmless error. Without a proffer of the substance of her testimony, it is not known if or how her testimony would have helped the defendant. Additionally, the defendant does not cite to the record to support the statement that Lucretia Egans was an eyewitness to the shooting. Apparently, this fact was never conveyed to the trial judge and we are unable to find it in the record. If Lucretia Egans was an eyewitness to the shooting, it was not discussed when defense counsel attempted to have her take the stand, when defense counsel attempted late endorsements of Diane Germany and Brent Rogers, or in the defendant's motion for a new trial. In his motion and at the hearing for a new trial, defense counsel only argued that the trial court erred in excluding the testimony of Brent Rogers and Darrin Fleetwood, also eyewitnesses.

It is within the trial court's discretion, subject to exclusionary rules, whether to admit or to exclude evidence. *State v. Friberg,* 252 Kan. 141, Syl. ¶ 5, 843 P.2d 218 (1992). The erroneous exclusion of evidence is governed by K.S.A. 60-405, which provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

It is well established that a party may not assert error based upon the erroneous exclusion of evidence in the absence of a proffer of that proposed evidence. See *State v. Hall,* 246 Kan. 728, 746, 793 P.2d 737 (1990); *State v. Nemechek,* 223 Kan. 766, 770, 576 P.2d 682 (1978); *State v. Watkins,* 219 Kan. 81, 85, 547 P.2d 810 (1976). Because there was no proffer, the defendant is not in a position to assert the trial court erred in excluding Lucretia Egans' testimony.

On the fourth day of trial, the defendant requested permission to call Brent Rogers and Diane Germany as witnesses. Neither witness had been endorsed. Defense counsel explained that both he and the defendant had not learned of either potential witness until the previous afternoon. Defense counsel apologized to the

State for the late endorsement, but pointed out this had been a difficult case for which to prepare a defense.

According to defense counsel, Brent Rogers had been afraid to come forward because he was on probation for a misdemeanor charge in Wyandotte County and had not paid the restitution and court costs as ordered and because he was "extremely" fearful of the Taylors. Defense counsel argued that this witness was vital to the defense. Brent Rogers had been sitting with Daralynn Brown on her porch on the night of the shooting. Daralynn's testimony earlier that day confirmed this. The substance of Brent Rogers' testimony would be that he saw both Curtis Taylor and Donny Taylor with guns, that he saw Curtis Taylor come from behind Lashonda's house and shoot the decedent in the head, and that he could identify other people, such as the defendant and Buck, who were present at the time of the shooting.

The substance of the testimony of Diane Germany, the decedent's aunt, would be that the decedent lived upstairs in her house and kept a silver-plated gun; that in the early morning hours of the night in question, Curtis Taylor and the decedent, who both had been drinking, showed up at her house; that they left with what she believed to be a gun; and that as they left, they told her they were going to "whip some ass." Defense counsel maintained Diane's testimony was vital because it corroborated that Curtis Taylor and the decedent had been together, had been drinking, and were in possession of a gun.

The State again objected, citing the pretrial order in which defense counsel agreed to provide the State with a list of defense witnesses seven days before trial. The State pointed out it only received the witness list at the recess of trial the day before. According to the State, it was prejudicial to allow these witnesses to testify because the State had not had the opportunity to visit with them. The State also claimed these witnesses' testimony was not reliable. The basis for the unreliability claim was that this testimony was inconsistent with the State's evidence.

Defense counsel offered to take a recess in order to let the State interview these witnesses.

The trial court decided to exclude the testimony of Brent Rogers and Diane Germany. The court relied upon the pretrial order, citing the importance and purpose behind pretrial discov-

ery conferences. The trial court acknowledged this was a case in which it was not easy for someone in defense counsel's "position to go into that particular area of town to have to try to interview witnesses and find people to testify," but noted that defense counsel had been allocated funds to employ an investigator. ($300 had been allocated.) Because of the investigator's services, the trial court concluded this was not a case of excusable neglect, *i.e.*, being unable to discover the witnesses earlier. The trial court expressed its skepticism about the reliability of Brent Rogers' testimony because Daralynn Brown had failed to mention previously that two males had been on the porch with her at the time of the shooting. The trial judge concluded: "I don't think our system of justice envisions running in a bunch of surprise witnesses at the last minute who would testify in a 180 degree difference from what all the state's evidence has been up to this time . . . ."

As far as the trial court was concerned, the evidence presented was uncontroverted that the defendant shot the decedent. Defense counsel responded that as he interpreted the evidence, there was speculation concerning from where the fatal shot was fired and that other people could have fired the shot. The trial court was not persuaded, noting several witnesses had testified the defendant shot the decedent. The judge again questioned the reliability of the proffered testimony, mentioning that if he, the judge, was interested in someone's welfare, he would have come forward immediately and shared all his knowledge with the police.

Because the substance of the testimony of Brent Rogers and Diane Germany was proffered, the question with regard to these proposed witnesses is whether the trial court abused its discretion in excluding their testimony. The defendant advances two reasons why the trial court abused its discretion: The trial court's reliance upon the pretrial order was erroneous, and the trial court failed to follow the factors set forth in *State v. Bright*, 229 Kan. 185, 623 P.2d 917 (1981).

With regard to the pretrial order, defense counsel, the prosecutor, and the trial judge all signed a standard form pretrial conference discovery document. Defense counsel checked "yes" beside the question asking whether the defense would "provide exhibit and/or witness list including dates of birth, addresses, and

race, as per K.S.A. 22-3212, and K.S.A. 22-3213, seven (7) days before trial." The defendant contends nothing in the language of the pretrial order requires him to provide any information other than what is required under K.S.A. 22-3212 and K.S.A. 22-3213. These statutes pertain primarily to the State's duty of revelation. See K.S.A. 22-3212(3)(the defendant has a limited reciprocal duty to permit the prosecutor "to inspect and copy or photograph scientific or medical reports, books, papers, documents, tangible objects, or copies or portions thereof, which the defendant intends to produce at trial, and which are material to the case and will not place an unreasonable burden on the defense."); K.S.A. 22-3213 (the prosecutor has a duty to produce statements and reports after a State witness testifies on direct examination at the preliminary hearing or at trial; a similar duty is not placed upon the defendant). The defendant argues the pretrial order is not a sufficient basis upon which to exclude the testimony because defense counsel complied with K.S.A. 22-3212 and -3213, which do not require defense counsel to produce witness lists.

With the exception of alibi witnesses, K.S.A. 22-3218, defense counsel has no reciprocal statutory requirement to disclose the names of defense witnesses prior to trial. The legislature, however, has authorized pretrial conferences in criminal cases. See K.S.A. 22-3217. Furthermore, this court encourages the use of pretrial conferences. We have stated that if pretrial conferences "are held, either in civil or criminal cases, both parties are bound by the agreements made at the conference and included by the judge in the order entered at the conclusion of the conference." *Bright*, 229 Kan. at 190. If this occurs and the agreement is of record, the pretrial order should be enforced. If the pretrial order could result in manifest injustice, the trial court has authority to modify the order. *Bright*, 229 Kan. at 192; see K.S.A. 22-3217; K.S.A. 1992. Supp. 60-216. Incorporated in the pretrial order in the instant case was the State's agreement to open its entire file to the defense and the defendant's agreement to disclose his witnesses.

More persuasive is the defendant's contention that in order to exercise its sound discretion, the trial court was obligated to follow the *Bright* factors and did not do so. In *Bright*, based upon the facts of that case, this court determined the exclusion of defense

witnesses was not reversible error. We then set forth factors for trial courts to follow in the future.

"If a defendant has been required by pretrial or discovery order to disclose defense witnesses prior to trial and fails to do so, and attempts to call a witness or witnesses not disclosed, then in ruling on prosecution objections the trial court should:

(1) Inquire why the witness or witnesses were not disclosed;

(2) determine when the witness first became known to defense counsel, and whether the nondisclosure was willful or inadvertent;

(3) determine whether the proposed testimony is trivial or substantial, whether it goes to an important or minor issue;

(4) determine the extent of prejudice to the State, and the importance of the witness to the defense;

(5) determine any other relevant facts;

(6) grant the State a recess if prejudice can be avoided or reduced by such action; and

(7) avoid imposing the severe sanction of prohibiting the calling of the witness if at all possible. This should be viewed as a last resort." 229 Kan. at 194.

The *Bright* court stated that a trial court *should* make these inquiries. Subsequently, in *State v. Cummings*, 242 Kan. 84, 87, 744 P.2d 858 (1987), we stated that "[i]n order for a trial court's discretion to be deemed sound, it *must*" consider these factors. (Emphasis added.) The *Cummings* court discussed the general rules about enforcing pretrial orders and then cited *Bright* as holding that automatic exclusion of such testimony is error.

If a trial court must consider these factors, as stated in *Cummings*, the trial court in the case at bar failed to exercise its discretion soundly because it did not address the *Bright* factors. Instead, the trial court focused upon the *quality* of the evidence, as perceived by the court, rather than the admissibility of the evidence. The trial court took it upon itself to determine the credibility of the proposed witnesses. Credibility is not one of the factors listed in *Bright*. The State argues that the *Bright* court's allowance of other relevant factors permits the trial court to engage in factfinding and to judge the reliability and credibility of the witness. If the trial court engages in factfinding and judges the witness' credibility, the trial court invades the province of the jury. See *State v. Jarmon*, 245 Kan. 634, 638, 783 P.2d 1267 (1989) ("Credibility of witnesses in criminal jury cases is an issue for the jury, not for the trial judge or the appellate courts.");

*State v. Jones*, 233 Kan. 170, 174, 660 P.2d 965 (1983) (a conflict in testimony presents a question of fact for the jury).

Also troublesome is the trial court's comment that our system of justice does not envision unendorsed defense witnesses testifying 180 degrees different from the State's evidence. The fact that defense evidence may differ from the State's evidence should not be surprising. Generally speaking, defense witnesses' testimony differs partially, if not substantially, from the State's evidence. Otherwise, there would be no reason for the defense to call its own witnessses.

In *Bright*, we noted that trial courts consistently permit the late endorsement of State witnesses (and we generally uphold those decisions). 229 Kan. at 192. Cases subsequent to *Bright* follow this pattern. See, *e.g.*, *State v. Damewood*, 245 Kan. 676, 685, 783 P.2d 1249 (1989); *State v. Hartfield*, 245 Kan. 431, 440-42, 781 P.2d 1050 (1989); *State v. Beebe*, 244 Kan. 48, 51-52, 766 P.2d 158 (1988); *State v. Phifer*, 241 Kan. 233, 239-40, 737 P.2d 1 (1987); *State v. McNaught*, 238 Kan. 567, 583, 713 P.2d 457 (1986). With regard to the late endorsement of State witnesses, the test is whether the defendant's rights have been prejudiced. *State v. Ferguson, Washington & Tucker*, 228 Kan. 522, 526, 618 P.2d 1186 (1980); see *State v. Thompson*, 232 Kan. 364, 367, 654 P.2d 453 (1982) (the defendant must show actual prejudice to his or her ability to defend the charges; prejudice is not presumed). Factors in making this determination include whether "the defendant was surprised and the testimony was critical." *Bright*, 229 Kan. at 192. "Normally, late endorsement is permitted if the opposing parties are given time to interview the witnesses and cross-check their testimony. [Citation omitted.]" *State v. Hunter*, 241 Kan. 629, 638, 740 P.2d 559 (1987); see *Hartfield*, 245 Kan. at 440. The importance of and the purpose behind the factors set forth in *Bright*, and affirmed in *Cummings*, cannot be overemphasized. The *Bright* factors ensure that trial courts evenly handle the late endorsement of witnesses, be they witnesses for the State or for the defense.

With this in mind, we apply the *Bright* factors to the case at hand.

The State emphasizes that when defense counsel learned of the potential witnesses, defense counsel did not disclose them

immediately, but waited until the following day. Therefore, according to the State, the nondisclosure was willful and designed to surprise the State and to prevent the State from investigating the witnesses. The State contends that, because the defendant had the benefit of an investigator's services to help locate witnesses, it cannot be said the nondisclosure was inadvertent. The State's arguments are, at best, speculative.

According to the State, the proffered testimony of Diane Germany, the decedent's aunt, went to a minor point because defense counsel failed to proffer a time frame in which Curtis Taylor and the decedent stopped by Diane's house, left with what she believed was a gun, and told her they were going to "whip some ass." The State maintains the incident could have been in reference to when Curtis Taylor, armed with a .38, and the decedent went to Elizabeth's house. If so, the State contends the proffered evidence was cumulative because Elizabeth, Curtis Taylor, and Buck all testified to these events. The defendant only needs to proffer the substance of the testimony, not every detail. See *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 2, 822 P.2d 591 (1991) ("The standard for a satisfactory proffer is whether the proffer contains the substance of the excluded testimony."). Moreover, defense counsel proffered a general time frame—after midnight in the early morning hours. Although the testimony varied about the time of the shooting, general consensus was that the shooting occurred between 1:00 and 2:00 a.m. The incident at Elizabeth's occurred earlier in the evening. Contrary to the State's assertion, Diane's testimony was important.

The State claims Brent's proffered testimony was not important because his testimony was not in agreement with the State's evidence. Brent would have testified that he saw Curtis Taylor, not the defendant, shoot the decedent. The State points out that not one State witness put Curtis Taylor at the scene when the shooting occurred. The question is not whether the State's evidence supports the proffered testimony. The question is whether the proffered testimony was substantial or trivial—whether it went to an important or minor issue. Brent's testimony was crucial to the defense because the testimony went to the ultimate question of who shot the decedent.

Contrary to the trial court's and the State's conclusions, Brent's testimony would not have been 180 degrees different from the State's evidence. Without restating the evidence set forth above, there was circumstantial evidence, as well as direct evidence, to support the conclusion that the defendant did not shoot the decedent.

In the context of whether the nondisclosure was willful, the State suggests defense counsel's nondisclosure was simply a maneuver to surprise the State and to prevent the State from investigating the witness. If this were true, why did defense counsel suggest a recess to allow the State to question the witness? Such a recess would have eliminated the surprise element. If needed, a longer recess could have been granted to allow the State time to investigate the witnesses.

Finally, the trial court failed to consider other options. The trial court did not attempt to avoid the severe sanction of refusing to allow defense witnesses to testify, which the *Bright* court viewed as a last resort.

The trial court abused its discretion by failing to address the rules set forth in *Bright*. Furthermore, applying these rules or factors to the facts of this case supports the inclusion of the proffered testimony of Brent Rogers and Diane Germany. Additionally, with regard to the proffered testimony of Brent, the error was not harmless because Brent would have testified that he saw someone other than the defendant shoot the decedent. Simply because the State presented substantial evidence to the contrary should not deny the defendant the opportunity to present and support his defense. The exclusion of Diane's testimony was not harmless because she would have placed the decedent and Curtis Taylor together and in possession of a gun prior to the fatal shooting. Neither witness' testimony would have been cumulative. The defendant's conviction is reversed, and the case is remanded to the trial court for a new trial.

The defendant also argues the trial court erred because it failed to instruct the jury on voluntary manslaughter and involuntary manslaughter as lesser included offenses of second-degree murder, the offense charged. He specifically requested the trial court to instruct on involuntary manslaughter, which the trial court refused. The court reasoned that there was no evidence the killing

was unintentional and that the defendant had testified he did not fire the fatal shot.

"It is a familiar rule, as codified in the statute, that a trial court has an affirmative duty to instruct the jury on lesser included offenses, including lesser degrees of the same crime; however, this duty does not arise unless there is evidence supporting the lesser offense." *State v. Patterson,* 243 Kan. 262, 267, 755 P.2d 551 (1988); see K.S.A. 21-3107. The trial court has an affirmative duty to instruct the jury on an appropriate lesser included offense regardless of whether the defendant requested the instruction. See *State v. Bowman,* 252 Kan. 883, Syl. ¶ 8, 850 P.2d 236 (1993).

A trial court has a duty to instruct on all lesser included offenses providing there is substantial evidence upon which the defendant reasonably might be convicted of those offenses. *State v. McBroom,* 252 Kan. 376, Syl. ¶ 1, 845 P.2d 654 (1993); *State v. Deavers,* 252 Kan. 149, Syl. ¶ 1, 843 P.2d 695 (1992); *State v. Humphrey,* 252 Kan. 6, Syl. ¶ 11, 845 P.2d 592 (1992); see *State v. Lumbrera,* 252 Kan. 54, Syl. ¶ 10, 845 P.2d 609 (1992) ("[T]he instruction need not be given if there is no evidence by which a rational factfinder might find the defendant guilty beyond a reasonable doubt of the lesser included offense."). The evidence, which must be viewed in the light most favorable to the defendant, may be inconclusive, unsatisfactory, and weak, and consist only of the defendant's testimony. *Deavers,* 252 Kan. 149, Syl. ¶ 1; *State v. Dixon,* 252 Kan. 39, Syl. ¶ 1, 843 P.2d 182 (1992); *State v. Evans,* 251 Kan. 132, Syl. ¶ 2, 834 P.2d 335 (1992).

The defendant asks this court to clarify the discrepancy in our cases regarding whether the evidence supporting the lesser included offenses must be offered by the accused. In *Patterson,* 243 Kan. 262, Syl. ¶ 3, this court held that *either the defendant or the State may offer the evidence* supporting the lesser included instruction. In *State v. Mayberry,* 248 Kan. 369, 385, 807 P.2d 86 (1991), this court stated that "before instructions on lesser included offenses are required there *must be positive testimony presented by the defense* to prove a version of the homicide contrary to the version presented by the State." (Emphasis added.) The determination of this matter is critical to the instant case because the defendant's testimony and the defense evidence

alone do not support instructions on voluntary manslaughter and involuntary manslaughter.

In support of its holding that either the State or the defendant may offer the evidence supporting the lesser included offense, the *Patterson* court relied upon *State v. Armstrong*, 240 Kan. 446, 460, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987), in which this court stated: "In order for the evidence to be sufficient to require instructions on lesser included offenses, testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving what events occurred at the time the homicide was committed." The *Armstrong* court cited *State v. Marks*, 226 Kan. 704, 714, 602 P.2d 1344 (1979), for support. The language in *Marks* is almost identical to the language in *Armstrong* and is quoted below.

The *Mayberry* court cited *State v. Garcia*, 233 Kan. 589, 608-09, 664 P.2d 1343 (1983), for direct support and *State v. Armstrong* for indirect support. In *Garcia*, this court commented:

"We have also pointed out that before instructions on lesser included offenses are required there must be positive testimony presented by the defendant for the express purpose of proving a version of how the homicide occurred which is contrary to the version presented by the State. *State v. Hutton*, 232 Kan. [545,] 554, [657 P.2d 567 (1983)]; *State v. Marks*, 226 Kan. 704, 714, 602 P.2d 1344 (1979)." 233 Kan. at 608-09.

The *Marks* court stated:

"In order for the evidence to be sufficient to require instructions on lesser degrees of the homicide, the testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving what events occurred at the time the homicide was committed. Contradictory statements of a witness which are offered only for the purpose of destroying his credibility and not as positive evidence to prove the matters contained in the statements are not alone sufficient to require an instruction on the lesser degrees of homicide. In all of the cases where we have required instructions on the lesser degrees of homicide in a felony-murder case, there has been positive testimony of either the defendant or another witness offered for the express purpose of proving a particular version of how the homicide occurred." 226 Kan. at 714.

In *State v. Hutton*, 232 Kan. 545, 554, 657 P.2d 567 (1983), this court quoted the above and then noted "no evidence was presented to refute the State's theory of premeditated or felony murder." The *Hutton* court continued:

"No positive testimony was offered by the defendant or any other witness to show that the homicide occurred any differently than the way in which the State presented it or to support a conviction of a lesser degree of homicide. Instead, the defendant relied upon an alibi defense . . . . As clearly pointed out in *State v. Marks*, there must be *positive testimony* presented for the express purpose of proving a version of how the homicide occurred which is contrary to the version presented by the State before instructions on lesser included offenses are required." 232 Kan. at 554-55!

The *Mayberry* and *Garcia* opinions used loose language construing *Marks*. The *Marks* court clearly stated that either the State or the defendant could offer the evidence tending to support the instruction of a lesser included offense. The statement about "positive testimony of either the defendant or another witness" is made in the context of felony murder. *Marks*, 226 Kan. at 714. In felony-murder cases, such as *Marks*, "the rule requiring instructions on lesser included offenses does not apply. . . . Instructions on lesser included offenses may be required only if the evidence supporting the commission of the underlying felony is weak, inconclusive, or conflicting." *State v. Nguyen*, 251 Kan. 69, Syl. ¶ 14, 833 P.2d 937 (1992). See *State v. Hobbs*, 248 Kan. 342, Syl. ¶ 3, 807 P.2d 120 (1991). *Mayberry, Garcia,* and the instant case are not felony-murder cases. The statements in *Mayberry* and *Garcia* that there must be positive testimony presented by the defendant supporting a lesser included instruction before the trial court is required to give that instruction are overly broad. Evidence supporting a lesser included instruction may be presented by either the defendant or the State.

It would serve no useful purpose to determine whether the trial court commited reversible error in not giving lesser included offense instructions in this case because a new trial is required on the first issue. When the case is retried, the trial judge will have to make a decision based upon the evidence presented in the new trial, which could have at least three new witnesses.

One further comment is necessary. Part of the trial court's reasoning in refusing to instruct the jury on involuntary manslaughter was that the defendant testified he did not fire the fatal shot. This alone is not a sufficient basis to refuse to give an instruction. If there is substantial evidence that would support a finding of involuntary manslaughter, then such an instruction

should be given notwithstanding a defendant's testimony that he or she did not commit the act resulting in death. See *State v. Rutter*, 252 Kan. 739, 850 P.2d 899 (1993) (discussing *State v. Smith*, 161 Kan. 230, 167 P.2d 594 [1946], in which it was held the evidence warranted a self-defense instruction even though the instruction was not requested and the defendant denied committing the act from which the death resulted).

Reversed and remanded for a new trial.