No. 68,550

STATE OF KANSAS, *Appellee*, v. PHILLIP MACK, *Appellant.*

(871 P.2d 1265)

Opinion filed April 15, 1994.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Robin A. Lewis*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is an eyewitness identification case. The issues, in addition to defendant's identification by the victim's mother, are whether the trial court erred in: (a) admitting into evidence an incident similar to the crime charged, (b) instructing the jury on aiding and abetting, (c) failing to suppress certain statements made by the defendant to the police, and (d) excluding a state-

ment made by the victim's brother, who was out of the country at the time of trial.

Phillip Mack, the defendant, was convicted of first-degree felony murder, K.S.A. 21-3401(b); aggravated robbery, K.S.A. 21-3427; and aggravated battery, K.S.A. 21-3414. The facts of the murder were recently before us in *Hamidan v. State Farm Fire & Cas. Co.*, 251 Kan. 254, 833 P.2d 1007 (1992). Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (a direct appeal from a conviction of a class A felony or if a maximum sentence of life imprisonment is imposed). Our standard of review on the evidentiary issues is abuse of discretion. *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993). We find no prejudicial error and affirm the trial court.

## Facts

During the late evening of January 25, 1989, Saed Razizadeh, the victim, was driving his car with his mother, Mrs. Hamidan; his brother, Seid; and Seid's girlfriend as passengers. The car was bumped suddenly from behind on Shawnee Mission Parkway in Johnson County. Saed's mother, who was sitting in the passenger seat, stated that an individual wearing a beige raincoat that fell below the knee and with "one sleeve in and the other sleeve . . . hanging over his shoulder" got out of the other car, came past the passenger window, and went around Saed's car. She said that they "exchanged glances just casually." She saw the man face-to-face and later said that he had been the driver of the other car. At trial, she identified Mack as the man she had observed that night.

According to Mrs. Hamidan, she saw Mack holding a gun. Saed was holding Mack's wrist with the gun up in the air. She screamed and exclaimed, "Oh, my God. They are fighting," opened the car door, and jumped out. Saed was on the ground, and Mack was kneeling down, going through Saed's pockets. Saed was dead.

Mrs. Hamidan was shot in the left arm. She had a face-to-face view of the man who shot her. She was shaking and "looking at him begging him not to do anything to [her] child." At that point, her other son, Seid, stood behind her. She explained that she "knew that [Mack] wanted to shoot" Seid, so she moved to protect

her son. A bullet hit her in the right arm. At the time she was shot, she was looking at the assailant and "concentrating very hard on him so I could control what was happening in case he wants to make a move or something." Later, she discovered a third bullet lodged in her purse. Mrs. Hamidan did not see anyone else in the car Mack was driving. She was taken to the Kansas University Medical Center. The doctor testified that her injuries were quite severe. She was hospitalized from the early morning hours of January 26 until February 3, 1989.

Scott Niswonger was driving on 63rd Street to the east in Kansas City, Missouri, on January 25, 1989, when his car was bumped from behind by another car. Niswonger stopped, got out of the car, locked his door, and walked around his car to see where it had been hit. The driver of the other car walked over to Niswonger, spoke to him briefly, pulled a gun out of his pocket and stuck it up against Niswonger's arm, saying, "Give me your money." Niswonger replied, "I don't have any money." Niswonger was shot in the elbow. Stunned, he started to run and was shot in the right hip. He kept running, turned around, and observed the assailant hitting the passenger side window of Niswonger's car. He assumed the man was after his checkbook and credit cards. He saw the assailant's car drive away with another person in the car. He described the shooter as a black male who was wearing a knee-length overcoat and a hat pulled down over his face. The car that had hit his car was a light colored, two-tone, rusty vehicle "like a Buick Regal." Niswonger never positively identified his assailant. Laboratory examinations confirmed that the .22 caliber cartridge casings discovered at the scene of both of the shootings were fired from the same gun. The Niswonger incident occurred approximately one-half hour after the murder of Saed.

Detective Richard McBrien honored the family's request to delay the interview of Mrs. Hamidan. Mrs. Hamidan did not speak English. Seid, her son, was used as an interpreter. Detective McBrien testified that Seid "was very emotional" and spoke "fractured English." Several questions had to be repeated during the interview. Mrs. Hamidan described the events and the shooter,

including the fact that he had a patch of " 'white, curly hair' " on his head. She told McBrien that she could identify the person who shot her son. At the conclusion of the interview, McBrien showed her a videotape lineup. The detective explained at trial that the videotape included the primary suspect, Rodney Mann, but did not contain Mack. Mrs. Hamidan was unable to identify anyone in the videotape lineup. On cross-examination, McBrien said that Mrs. Hamidan expressed concern about poor lighting conditions and the absence of her eyeglasses at the murder scene.

Metro Squad police officers responded to a call regarding a stolen car that matched the description of the vehicle which had been involved in Saed's murder. They located a "white over blue" 1979 Buick Regal with Missouri license plates. A forensic chemist concluded that the paint chips taken off the Buick were from Saed's car.

The investigating detectives looked for a man who had a street name of "Bay Bay." Mack, answering to "Bay Bay", was interviewed by the police. He was free to leave any time. The interview was voluntary. According to Detective McBrien, when Mack provided information that was directly related to the homicide, he was advised of his *Miranda* rights. Mack said that he understood his rights. He explained the events related to Saed's death and implicated Arthonio Watkins as having been present and Rodney Mann as the shooter. The officers conducted a videotape interview. (The videotaped interview of January 30, 1989, shows Mack with a white patch of hair.) Mack again was read his *Miranda* rights. He signed a written rights waiver form. During the videotaped interview, Mack related details of Saed's murder and of the Niswonger shooting. He denied that he was the shooter but admitted to being present at both crimes with Watkins and Mann.

One detective noted that Mrs. Hamidan was upset and started to cry when he explained, on January 31, 1989, that they were at the hospital to show her lineups. He gave her the three photo lineups. Mrs. Hamidan did not identify anyone in the photos. All three suspects, Mack, Mann, and Watkins, appeared once in both the photo and videotape lineups. The detectives showed Mrs. Hamidan the videotape lineup. After she observed the entire vid-

eotape lineup, she stated that she was interested in again seeing person number 4, who was Mack. The detectives replayed the videotape lineup and again she said that she wanted a better look at number 4. A detective explained that he tried to pause the tape on that position, but static lines appeared every time, distorting the image. Mrs. Hamidan said the picture looked familiar but that she was not comfortable with saying that number 4 was the shooter.

Mrs. Hamidan viewed different photographs in April 1989, just before her departure from the United States. She appeared to have recovered from her injuries and was not on any medication. The detective showed her three Polaroid photographs, one each of Mack, Watkins, and Mann. Seid was present to act as an interpreter. The detective

"explained to [Seid] that I was going to show them—show her some photographs, and that it didn't necessarily mean that she had to pick out anybody. I needed to show them to her to see if she recognized any one of these individuals as being the person who shot her and shot her son, and I gave him a very strong statement as far as saying that we had to be positive; that we could not guess on profile or we think or we thought. It had to be positive, and if this person wasn't there, he just simply wasn't there."

Mrs. Hamidan began to cry uncontrollably when shown the photographs. Seid said that Mrs. Hamidan recognized the shooter. She pointed to Mack's photo.

The detective then showed Mrs. Hamidan two videotapes, each containing a lineup. One tape included Watkins and Mack; Mann appeared in the other. She was advised to tell the detective whether she recognized anyone and was informed that she did not have to select anyone. Mrs. Hamidan again began to cry and identified Mack. She was sobbing and said she was positive that Mack was the person who had shot her. She did not become emotional when she saw anyone else.

Mrs. Hamidan returned to the United States. She was shown a photographic array on April 14, 1990, with 10 photos, including those of Mack, Mann, and Watkins. An independent translator was present. A detective handed Mrs. Hamidan the stack of photos and asked if she could identify the shooter. Mrs. Hamidan

took her time looking at each photo. When she came to the ninth photo, which was Mack's, she became emotional and informed the translator that Mack was the shooter. She suggested that Mack's appearance had "changed a little bit. His hair was a little longer and it appeared to her that he had put on a little weight." The detective testified that the differences highlighted by Mrs. Hamidan accurately described the changes in Mack's appearance.

Mack had a history of mental illness. Hearings were held to determine his competency to stand trial. The trial court twice ordered Mack to undergo a mental evaluation. Mack was found incompetent to stand trial on June 4, 1991, and was referred to Larned State Security Hospital for evaluation and treatment. On September 18, 1991, he was found competent to stand trial. He did not claim to be incompetent at the time of his trial.

Mack's motion to suppress Mrs. Hamidan's in- and out-of-court identification was denied. At trial, defense counsel objected to the in-court identification of Mack by Mrs. Hamidan. The objection was overruled. Defense counsel did not object when Mrs. Hamidan was questioned regarding her out-of-court identification.

### Mack's Identification Contentions

Mack emphasizes that in *State v. Warren*, 230 Kan. 385, 392, 635 P.2d 1236 (1981), we acknowledged the possibility of an innocent man being punished through a mistaken identification by an eyewitness. The police, in the case at bar, initially followed proper procedures, and Mrs. Hamidan was unable to make an identification. Mack contends that when she was unable to identify him, "the police decided to throw out the book and play by their own rules."

An eyewitness identification due process determination is a mixed question of law and fact that should be reviewed de novo. Mack claims the identification procedures employed were unnecessarily suggestive. Mrs. Hamidan could not identify anyone during the week after the crime. She had expressed concerns about her ability to pinpoint the attacker due to the poor lighting and absence of her eyeglasses.

Mack applies the facts to the five identification reliability factors set out in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), and asserts that the factors do not support a finding of reliability. The *Biggers* Court listed as factors:

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199.

See *State v. Alires*, 246 Kan. 635, 639, 792 P.2d 1019 (1990). Mack maintains that the last-minute identification created a substantial likelihood of a mistaken identification; consequently, all later identifications were tainted and Mrs. Hamidan should not have been allowed to identify Mack in court.

### Discussion

The fact that Mack's photograph was shown to Mrs. Hamidan more than once does not require a finding that her identification should be excluded. See *State v. Bey*, 217 Kan. 251, 259, 535 P.2d 881 (1975). When Mrs. Hamidan first was shown Mack's photograph, she had just suffered severe injuries, the loss of her son, and was receiving high doses of medication. While she watched the videotape lineup, she continuously requested that the tape be stopped on Mack's image, but each time the tape paused the image was distorted.

Mack moved to have the identification suppressed. The only basis he provided for the suppression was Mrs. Hamidan's initial inability to identify her attacker, the repeated showing of his photograph, and the fact that he was the only "black male sitting at counsel table" during the preliminary hearing. At the hearing on Mack's motion to suppress, the State claimed Mack failed to state sufficient grounds to satisfy his burden to support suppression. The State noted Mack's failure to set forth a procedural deficiency such as an assertion that the photographs were suggestive or that a particular officer told Mrs. Hamidan who to select. Mack is precluded from raising for the first time on appeal points not raised before the trial court. Mack cannot prevail by presenting, on appeal, reasons for suppressing the identification that were not

presented to the trial court. *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986).

The first step of the eyewitness identification test established in *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), has not been satisfied (initially, a court must decide whether the procedure used in making an identification was unnecessarily suggestive). See *State v. Skelton*, 247 Kan. 34, 39-40, 795 P.2d 349 (1990). The procedure employed by the police was not unnecessarily suggestive. The detectives neither suggested that Mrs. Hamidan had to select a person nor that the individual they believed to be the murderer was pictured in any of the photographic arrays. Detective Denning testified there is nothing improper about showing three Polaroids. Mack failed to support his claim that a three-photo array is objectionable. The events surrounding the identification did not create a substantial likelihood of an "irreparable misidentification which would deny due process." *Skelton*, 247 Kan. at 40. An application of the five *Biggers* factors shows that the identification procedure was not unduly suggestive. Furthermore, Mrs. Hamidan's in-court identification is independent and is admissible, even if the photographic procedure had been tainted. *State v. Slansky*, 239 Kan. 450, Syl. ¶ 2, 720 P.2d 1054 (1986).

At trial, Mack had an opportunity to cross-examine Mrs. Hamidan concerning various reliability considerations. She also was questioned about her interaction with the police. The trial court did not err in refusing to suppress the identification.

## The Niswonger Shooting

The trial court denied Mack's motion in limine seeking an order prohibiting the State from introducing evidence of the Niswonger shooting. During argument, the trial court stated:

"THE COURT: If the Court allowed it as res gestae, would the State have any objection to a—

"[THE PROSECUTOR]: Limiting type instruction?

"THE COURT: —limiting type of instruction such as 60-455.

"[THE PROSECUTOR]: No.

"THE COURT: I am not sure—see, we haven't offered [defense counsel] even the opportunity at this time under 60-455."

Nothing further was said. Defense counsel renewed his objection to the testimony at trial. The trial court again overruled the objection and then cautioned the jury:

"Ladies and gentlemen of the jury, evidence is now going to be admitted tending to show that the defendant was involved in a crime other than the present crime charged. This evidence may be considered by you solely for the purpose of proving the defendant's knowledge and for no other purpose."

Mack contends that the only issue in the case concerned whether Mrs. Hamidan's identification was sufficient to prove his guilt. According to Mack, evidence of the second crime was irrelevant because Niswonger was unable to identify his assailant. Mack believes the evidence of the second bump and run was prejudicial and deprived him of a fair trial. He highlights the fact that there was substantial evidence that the same person committed both the Missouri and Kansas bump-and-run crimes. The evidence suggested that the Missouri crime would go unresolved. He claims that these facts placed improper pressure on the jury to convict, despite the weak identification evidence.

The State observes that the Niswonger shooting was admitted as part of the res gestae of the Kansas crime. The State accents Mack's failure to argue that the evidence was inadmissible as part of the res gestae. Evidence of the Niswonger incident, according to the State, was relevant and necessary to show the accuracy of Mack's January 30, 1989, statement. The State also argues that the evidence was critical because Mack filed a notice of alibi. Although alibi evidence was not presented at trial, Mack did not retract his alibi defense.

The Niswonger shooting had a direct bearing on and relation to the offense in the case at bar. The record does not reflect and we need not speculate on the trial court's reasoning for admission of such evidence. The evidence was relevant and admitted to show Mack's knowledge as reflected in his January 30, 1989, statement. Evidence that is otherwise relevant in a criminal action is not rendered inadmissible because it may reveal another offense. *State v. Holt*, 228 Kan. 16, 21, 612 P.2d 570 (1980). The evidence was admissible independent of K.S.A. 60-455 or res gestae. We affirm the trial court's decision as correct. See *State v. Wilburn*,

249 Kan. 678, 686, 822 P.2d 609 (1991). The two incidents were logically connected.

### Aiding and Abetting Instruction

Jury instruction No. 15 stated: "A person who, either before or during its commission, intentionally aids another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime." Mack's counsel objected to the giving of this instruction, reasoning that it had no factual basis. The trial court overruled the objection.

Mack contends that he was unfairly surprised by the instruction and it created the possibility that the jury would choose a factually insufficient theory of guilt. Mack recognizes that in Kansas a charging document is not required to allege an aiding and abetting theory.

During deliberations, the jury asked two questions related to the instruction. First, the jury questioned, "Were there any statements given by [Watkins] and [Mann], and if so, why were they not made available to us?" The trial court replied, "You have received all the evidence you may consider." Second, the jury asked,

"The jury requests further clarification of how we are to interpret instruction number fifteen, if possible. . . *e.g.* if defendant accompanied the other two men knowing in advance their intent to commit a crime but defendant did not take any overt action in the crime, does this constitute promoting and assisting in the commission of the crime?"

The trial court responded, "No further clarification is possible."

According to Mack, the jury was speculating regarding hypothetical aiding and abetting theories. He asserts that there is a reasonable basis for concluding that the jury chose the aiding and abetting theory, which he claims was not supported by the facts. He contends that the district court compounded the situation by (1) overruling his objection to the instruction, and (2) failing to give the jury a specific verdict form that he believed would eliminate any possibility of error in the event that the jury convicted on the eyewitness identification evidence.

Mack told the police that he was with Mann and Watkins when the crimes were committed. Mack said that Mann was the principal actor and that Mann and Watkins were present when Niswonger was shot. Mack was not unfairly surprised. He not only admitted to staying in the car while the Razizadeh and Niswonger crimes occurred, but also confessed to being present when Mann talked about going to Kansas to find someone to rob. Mack has failed to adequately support his contention that the jury's behavior shows that the aiding and abetting evidence was insufficient.

We find no error in either the instruction or the general verdict form. See *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 376, 112 S. Ct. 466 (1991); *State v. Skelton*, 247 Kan. at 50; *State v. Lashley*, 233 Kan. 620, 628, 664 P.2d 1358 (1983).

## Mack's Statements

Mack filed a motion to suppress his statements to the police. The motion alleged, among other things, that he did not voluntarily and knowingly waive his right to counsel and that the police continued to question him after he invoked the right. He filed another motion, seeking to have all statements obtained by a psychiatric nurse suppressed. He alleged, among other things, that the statements to the nurse were involuntary due to his mental illness. The State agreed to stipulate that anything Mack said after he invoked his right to counsel was not admissible. Consequently, the trial court granted the motion as to certain statements, including those made to the nurse. The trial court denied the motion as to Mack's original statements given to the police.

Mack suggests that defense counsel made it clear at the pretrial suppression hearing that, due to his mental illness, his statements were not voluntary. He explains that although the mental health report was not available at the pretrial hearing, it was available to the judge well before trial. Mack maintains that his pretrial evaluation provides evidence that he was acutely psychotic at the time he made uncounselled incriminating statements to the police. The mental health report does not support Mack's analysis.

Mack claims his January 30, 1989, statement bolstered Mrs. Hamidan's identification and that without this statement he probably would not have been convicted. He asserts that based on all

the evidence, there is no proof that his statement was a product of his free will. Consequently, he believes the statement was unreliable evidence. Mack concludes that the statement should not have been admitted.

The State accents the fact that Mack's amended motion to suppress did not include an allegation concerning mental illness. The State again asserts that Mack cannot appeal issues that were not initially presented before the trial court, citing *State v. Burgess*, 245 Kan. 481, Syl. ¶ 6, 781 P.2d 694 (1989).

We addressed a similar contention regarding a defendant's mental illness in relation to the admissibility of a statement to the police in *State v. Snodgrass*, 252 Kan. 253, Syl. ¶ 3, 843 P.2d 720 (1992). A defendant's statement must be voluntary to be admissible. In determining whether a statement is voluntary, the court must consider the totality of the circumstances surrounding the taking of the statement. Mental capacity is one relevant factor bearing upon the determination whether a statement is voluntary.

The allegation of Mack's mental illness is insufficient to support a finding that the statement should have been suppressed. Mack's statement was not the result of police coercion or overreaching. Mack was not under arrest when he voluntarily accompanied the police officers to the station. He was informed that he did not have to go with the officers and that he was free to leave. The officers read Mack his *Miranda* warnings when he made incriminating statements. The *Miranda* warnings were given before Mack's discussion of the Razizadeh incident. Mack voluntarily waived his rights and spoke freely with the officers, never suggesting that he wished to stop talking or speak to an attorney. Mack again received *Miranda* warnings through a written waiver form before the videotaped interview. He said that he understood his rights and wished to speak with the officers. Review of the videotaped statement demonstrates that officers did not have difficulty conversing with him. We believe that Mack was capable of rationally talking with the police officers. K.S.A. 22-3215(4) provides that the prosecution has the burden of proving that an admission or confession is admissible. The State satisfied its burden. The statement was properly admitted.

### The Statements Made by the Victim's Brother

Mack's counsel planned to admit statements made following the shooting by Seid, the victim's brother. Counsel said that Seid, who was living in Germany, had not yet arrived. Consequently, the statements, according to counsel, should be admitted under K.S.A. 1993 Supp. 60-460 (d) (2) (excited utterance) and (3) (unavailable witness). Mack's counsel argued that Seid was an unavailable witness under K.S.A. 60-459(g)(4) (" 'unavailable as a witness' includes situations where the witness is . . . absent beyond the jurisdiction of the court to compel appearance by its process"). The proffer on Seid's unavailability was that the public defender's investigator sent Seid, who was living in Germany at the time, a letter in late December 1991 and a certified letter in January 1992. The trial began on February 24. Each letter requested that Seid contact the public defender's office. The State objected to the admission of Seid's statements and argued that the letters did not ask Seid to come back to testify. The State also asserted lack of diligence. The trial court acknowledged that it could not compel Seid to return from Germany but did not believe that Seid's unavailability had been proven.

Mack's counsel wanted to admit Seid's statements made to Detective Hinkle at the time the photographic lineup was shown to Mrs. Hamidan in January. Seid selected a photograph of another individual, Michael Baldwin, although the identification was not positive. Baldwin was chosen for the array because he had characteristics similar to Mann's. Defense counsel wanted to introduce forms that indicated Seid's selections. (The forms are not in the record.) The State objected on the basis that the evidence was hearsay. The trial court denied Mack's motion.

Mack maintains that the trial court erred in excluding the evidence as hearsay because (1) the statements were not offered to prove the truth of the matter asserted; (2) they were admissible under a statutory hearsay exception; and (3) his right to present a defense overrides any State interest in enforcing the hearsay statute. Mack asserts that Seid's statements were offered to show the unreliability of Mrs. Hamidan's identification. He argues that the statements were not hearsay under K.S.A. 1993 Supp. 60-460.

Mack also contends that the trial court should have admitted Seid's statements on the ground of general necessity under K.S.A. 1993 Supp. 60-460(d)(3). Seid was in Germany, beyond the trial court's authority to compel his appearance in court. Mack reasons that Seid made the statements in good faith without any motive to falsify. He believes that evidence of Seid's good faith is supplied by the fact that Seid ultimately admitted that the identification was not positive.

Finally, Mack argues that even if the evidence was hearsay, it should have been admitted. He reasons that evidentiary rules must sometimes give way to a due process guarantee of fundamental fairness, citing *Rock v. Arkansas*, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987) (Arkansas evidentiary rule which excluded an accused's hypnotically refreshed testimony violates the accused's constitutional right to testify on his or her own behalf.). Mack emphasizes that the fact that a second eyewitness contradicted the State's key witness was crucial. He concludes that exclusion of Seid's testimony was an error that justifies a new trial. We do not agree.

Seid was an unavailable witness. He was living in Germany and was beyond the jurisdiction of the court to compel appearance. See K.S.A. 60-459(g)(4). His statements were made the day after the shooting. They were recently perceived and made while his memory was fresh. The statements were given to a police officer who was in the early stages of the investigation. There is no reason to believe that Seid would have had a motive to falsify or distort the evidence. The trial court exercises discretion, subject to exclusionary rules, whether to admit or to exclude evidence. *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993). Under the facts in the case at bar, we find an abuse of discretion.

Mack confessed to having been present at the scene of the crime with Watkins and Mann. We have reviewed the evidence surrounding Mrs. Hamidan's identification. Seid's selection of Baldwin's photo (the identification was not positive), if admitted, would not have altered the result. Therefore, the error was harmless.

Affirmed.