NOT DESIGNATED FOR PUBLICATION

No. 115,552

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RICHARD P. LANGSTON,
*Appellant.*

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed October 13, 2017. Reversed and remanded.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant, and *Richard P. Langston*, appellant pro se.

*Ethan Zipf-Sigler*, assistant district attorney, *Mark A. Dupree*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., LEBEN, J., and PATRICIA MACKE DICK, District Judge, assigned.

LEBEN, J.: Richard P. Langston was convicted on 20 counts of sexual exploitation of a child after officers armed with a search warrant found 20 sexually explicit images of girls on his computer. At trial, the court excluded Langston's attempt to present evidence that others had access to the computer as well as evidence that another resident not only used the computer but also had girls' toddler underwear and a child sex doll in his

bedroom. The court excluded that evidence primarily because Langston's attorney hadn't disclosed the witnesses at least 10 days in advance of trial.

But a defendant has a constitutional right to present his or her theory of defense, and this testimony was critical here to Langston's defense, which was that he didn't know these images were on the computer. Evidence that others had access to the computer, that the computer passwords were written down in plain sight, that others had used the computer without noticing the images (like Langston, he argues), and that another resident who used the computer had children's underwear and a child sex doll in his bedroom fit squarely within Langston's theory of defense. The total exclusion of this evidence violated Langston's right to a fair trial, so we reverse the district court's judgment and remand the case for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

This case began with an anonymous tip that Langston had child pornography at his apartment. Based on the tip, officers from the Kansas City, Kansas, Police Department got a warrant to search his apartment, part of a four-plex living arrangement. They seized a computer and a detached hard drive on a desk in a common area off the living room.

After the hard drive was assessed by a forensic examiner, the State charged Langston with sexual exploitation of a child for possessing images of suspected child pornography. The State ultimately tried Langston on 21 separate counts based on separate images stored on a computer hard drive.

At the start of trial, before jury selection, the court asked defense counsel how long he thought the defense case would take so that the court could give a realistic trial-length estimate to potential jurors. When defense counsel said he had five or six witnesses in addition to a defense expert, the court immediately inquired about whether the witnesses had been disclosed to the State. When the prosecutor said they had not

been, the court said that "the discovery process [the] Wyandotte County District Attorney's Office utilizes that when you ask for discovery, you indicate [your witnesses] what, within 10 days?" The prosecutor then said that the defendant "didn't proceed with" a request for a copy of the State's file but argued "it's still mandated by statute that we have to know within a reasonable time prior to [trial] if there's any discovery done under the statute, which there was." The defense had separately obtained pretrial access, by court order, for its expert to examine the computer drives and images. So the prosecution objected to all defense witnesses except the defense's expert witness, who had been disclosed before trial.

The court made an initial ruling that defense counsel couldn't mention these witnesses in opening statement. The court then ordered: "So give 'em the names and see what they can do with it in the next day . . . ." The court postponed final ruling to see whether the State could sufficiently investigate the potential witnesses' testimony in that time frame. The parties then proceeded with jury selection.

After that, the prosecutor asked to raise further issues about potential defense witnesses. The State then objected to potential testimony from Langston's mother. Langston's attorney said she would testify that she had seen numerous people using the computers several months before the search of the apartment, knew that the passwords to access the computers were written down in the communal area, and had never seen the images at issue while she was using the computers. But the prosecutor argued that she wasn't living in town during the time period of the search and when the State would show at least some of the images were accessed. The State argued that her testimony would violate the third-party evidence rule, which generally requires some evidence connecting a third party to the crime before a defendant may offer evidence that the third party had some motive to commit the offense. Defense counsel countered that the defense expert would testify that some of the images had been downloaded while Langston's mother was still in town.

3

The court then asked for each attorney to separately address each of the defendant's proposed nonexpert witnesses. Ultimately, Langston's attorney said he wanted to call four other witnesses who would testify that they had seen many people using the computer:

- John Bassett, manager of the complex where Langston's apartment was part of a four-plex. Defense counsel said that he would also testify that he had witnessed other people using the computer and that the passwords were readily available.

- Gerald Mason, who counsel said would testify that he had sold the computer containing the hard drive to Langston and had downloaded family pictures for Langston. Defense counsel also said Mason would testify that he had later repaired the computer and hadn't become aware of any images of child pornography.

- Wanda Wileford, with whom Langston apparently lived for part of the time at issue. Defense counsel said that she would testify that he was living with her during some parts of the time period the State alleged he was possessing the images to establish that he didn't have access or control of the computers.

- Carl Wilson, another resident of Langston's apartment, who defense counsel said saw people other than Langston using the computer, none of whom saw pornographic images.

Langston argued that this evidence was important to his defense because it suggested that others had control of the hard drive and could have downloaded the files and that someone could use the computer without being immediately aware of the images at issue, which is what Langston claimed to have done.

The State objected to the admission of the previously undisclosed witnesses' testimony on two grounds: (1) that the late disclosure had unduly prejudiced the State because it was unable to fully investigate them; and (2) that the testimony would be inadmissible under the third-party evidence rule.

4

The district court focused on the defense's failure to disclose these witnesses before trial: "Just think of the magnitude of stuff you are throwing at the State, you know, right now after we've conducted [jury selection]." At another point, after defense counsel noted that there were dozens of people who had used the computer, the court said: "So you think it's okay to be able to put the blame—and that's my word, not yours—on dozens of people [with you] not ever having told the State a single name, not ever told the State or the court the requisite information of a proffer that is required by Kansas law and it's supposed to be okay? I tend to disagree." The court also asked: "Why didn't you provide those [witness names] a long, long, long time ago as Kansas law requires?" The court said it would leave the issue open for reexamination after the State presented its evidence, but emphasized that "this is absolutely too late, it is absolutely insufficient—too late an endorsement of witnesses to this magnitude."

The court ultimately allowed only Mason to testify, and only about how he had sold the hard drive to Langston and downloaded family photos. The court refused to allow Mason to testify to the fact that he had never seen child pornography on the computer, concluding that this evidence was irrelevant and that Langston had failed to give proper notice of the witness to the State.

Langston also sought to implicate his former roommate, Damian Eker, who could not be located. Langston wanted to testify or introduce evidence that he had given the hard drive to Eker; that Eker had access, expertise, and opportunity to use the computers; and that police had found girls' toddler underwear and a child sex doll in Eker's bedroom. The State objected that this too was disclosed only right before trial and the late notice would be highly prejudicial; the prosecutor said detectives hadn't had an opportunity to try to track Eker down and again argued that the evidence would violate the third-party evidence rule. Langston argued that the third-party evidence rule didn't apply because there was sufficient evidence connecting Eker to the crime: Eker had the ability to exercise actual physical control over the hard drive and the expertise to download the

5

files. The defense contended the child sex doll was evidence of Eker's motive to look at child pornography. According to a detective's affidavit, the doll was "a homemade childsize doll" wearing children's clothing, with "holes cut out where the vagina and anus would be" and with what appeared to be bodily fluids on the clothing. But the district court excluded the evidence, concluding it would violate the third-party evidence rule because Langston hadn't established a sufficient connection between Eker and the charges facing Langston.

In presenting its case, the State called Corporal Thad Winkelman from the Shawnee County Sheriff's Department to testify about the evidence recovered on the hard drive. Winkelman had received special training as a forensic examiner in collecting, examining, and preparing digital evidence. Winkelman testified that the username on the hard drive was "Cali," which was associated with Langston. The hard drive was set up so that the "Cali" username pathway opened to a desktop with several content folders. Winkelman explained where each of the charged images was located and the date that the image was last opened or accessed. The images were found saved in several different folders and subfolders with labels including "young ones," "daddy's SP friends," "good porn pics," "XXX," and "lil ones." Winkelman testified that the hard drive also contained nonpornographic images and files linked to Langston, including family photos and videos, which were kept in a folder titled "photos of fam, faith, me and Sam."

As part of the forensic examination, Winkelman also examined the images to determine whether they had been modified in some way. In his opinion, although some of the images had been enhanced, none appeared to have had their content changed. On cross-examination, the defense asked him about pixilation in some of the images. Winkelman attributed the pixilation to the process of transferring the photos, which required compressing and decompressing the image.

The State also called Elizabeth Frazier to testify. She testified that she had gone to Langston's home multiple times to do drugs with him and had been arrested there for drug use. She stated that on a few occasions she had seen Langston on the computer looking at images of young girls with no pubic hair and small, undeveloped breasts engaging in sexual conduct. She testified that she did not report it to the authorities and had only told detectives about it after they approached her during their investigation of Langston.

Detective Jackie Lynn of the Kansas City, Kansas, Police Department also testified on behalf of the State. She worked in the Child Abuse Unit at the time and was assigned to investigate an anonymous tip to the Kansas Department of Children and Families. Another officer reached out to Elizabeth Frazier because Frazier knew Langston. It was based on Frazier's information that the officers got their search warrant for Langston's apartment. Lynn testified that she was concerned because officers found toddler-sized girls underwear all over the apartment and did not believe any child was living there. On cross-examination, the defense questioned Lynn about the anonymous tip, which had alleged that Langston possessed child pornography including images of his 10-year old daughter. Lynn testified that Langston told her that he did not have a 10-year old daughter and that the information had come solely from the anonymous tip. Defense counsel also attempted to ask Lynn about a child sex doll that was found in Eker's room, but the court concluded that the testimony was irrelevant to whether Langston possessed child pornography and excluded it.

The State also called Dr. Terra Frazier, a child-abuse pediatrician, as an expert witness. She was asked to assess the age of the people in the images found on the hard drive and had done this type of examination on other occasions. She testified that it was her expert opinion that the charged images all showed children under the age of 18, although she did note that exhibits 12, 20, 23, and 24 featured girls who were more mature and developed than the other photos.

In presenting his defense, Langston called Joseph Wilson, a managing partner of JNJ Tech, who had experience in manipulating photos as part of his work. He testified that he believed exhibits 5, 10, 17, 18, 19, and 25 had evidence of manipulation due to pixilation and other traits of the images. Wilson also testified that technology can be used to digitally manipulate photos of adults to look as if they were under the age of 18. He acknowledged that he had no previous experience in child-pornography cases and had never used age-regression technology in his work. On cross-examination, he agreed that 19 of the 21 images were not pixilated near the breast or pubic area.

Langston also testified in his own defense. He said that he had two computers—the hard drive with the challenged images was in a computer he had purchased from Gerald Mason. He said the other computer had been inherited and should have been up in his office; he said he didn't know why it was found downstairs in the common area when police searched the apartment. Langston said he had been away from the home for long periods of time in 2012 and 2013.

Langston admitted that he'd had some illegal drugs in the apartment. He said that when he saw police arrive to search the house, he gathered up drugs and other evidence of illegal activities and took off in his truck. Having left the computer hard drive with the challenged images behind, Langston sought to raise the inference that he didn't know there were illegal images on that computer. Langston specifically testified that he had no knowledge of the images and that had he known about the images, he would have removed them with the other illegal items. He also said that he had never looked at any pornographic images in front of Elizabeth Frazier. Langston said Frazier had a reason to lie because they had slept together once and had a falling out that resulted in her threatening to have him beat up.

The jury found Langston guilty of 20 of the 21 counts of sexual exploitation of a child under the age of 18. (The jury found him not guilty with respect to one specific image.) The district court sentenced Langston to serve 89 months in prison. The court's original sentence included a 24-month period for postrelease supervision, but the court later corrected that and imposed lifetime postrelease supervision in accordance with the sentencing statutes for this offense.

Langston has appealed to our court. In our decision, we will generally cite to statutory provisions as they existed at the time of Langston's offenses, though we are not aware of any change in them that would significantly affect the issues we will be addressing.

ANALYSIS

I. *The District Court Erred When It Precluded Key Evidence in Support of the Defendant's Case.*

A defendant is entitled to present his or her theory of defense. Accordingly, the exclusion of evidence that is key to the defense case violates a defendant's fundamental right to a fair trial. *State v. Maestas*, 298 Kan. 765, 781, 316 P.3d 724 (2014). And while the defendant's right may be limited by rules of evidence, 298 Kan. at 781, those limits may not be applied arbitrarily or disproportionately to legitimate state interests. *Rock v. Arkansas*, 483 U.S. 44, 55-56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). Doing so would violate a person's Sixth Amendment right to call witnesses in one's own defense. *Rock*, 483 U.S. at 52; *State v. Suter*, 296 Kan. 137, 143-44, 290 P.3d 620 (2012). An appellate court reviews a claim that a defendant was denied the constitutional right to present his or her defense independently, without any required deference to the district court. *Maestas*, 298 Kan. at 780.

9

To consider what might be essential to Langston's defense at trial, we must start with what the State had to prove to convict him. The State charged Langston with 21 counts of sexual exploitation of a child for possessing 21 separate images. The State had to prove that Langston possessed visual depictions of a child under 18 years old shown engaging in sexually explicit conduct—and that he did so with the intent either (1) to arouse or satisfy the sexual desires or (2) to appeal to the prurient interests of himself or another person. See K.S.A. 2012 Supp. 21-5510(a)(2). To prove that Langston possessed the materials, the State had to prove that he had either joint or exclusive control over each image "with knowledge of or intent to have such control" or that he kept them "knowingly . . . in a place where [he had] some measure of access and right of control." See K.S.A. 2012 Supp. 21-5111(v).

With what the State had to prove to convict in mind, Langston's defense was straightforward: He argued that he didn't know the images were on the computer hard drive. If the jury had a reasonable doubt about whether he had that knowledge, it couldn't convict him.

In context, then, the district court's limitations on the evidence Langston could present were very significant. The State argues that Langston was still able to present his basic defense. After all, he testified that he didn't know about the images. But without corroboration from other witnesses or some key fact he might cite that would have been inconsistent with his having had knowledge of the images, his case would be quite weak. A defendant's constitutional right to present his or her defense isn't met simply by allowing the defendant to present a weak case while excluding the best evidence that could support the defense case.

The evidence Langston cites on appeal would have helped corroborate his claim that he didn't know about the photos:

- Two witnesses (Bassett and Wilson) would have testified that others used the computer without knowing there were illicit images accessible there. This would have made it more believable that Langston could have used the computer without having knowledge of the images.

- Bassett also would have testified that the passwords needed to get access to various files and folders on the computer's hard drive—including those containing the images—were readily available. During deliberations, the jury sent several questions, including what the password was and how the password was known. Such questions would be relevant if one or more jurors wondered either how easy the password would have been to guess or whether it was available to others in the apartment. *Someone* had to have put the images on the hard drive. If the password giving access to those files was widely known or readily discoverable, that would have made it more believable that Langston had no knowledge of the images because someone else had put them there.

- Langtston's own testimony that he had given the specific hard drive that contained the images at one point to Damien Eker, who then lived in the apartment, similarly showed that another person had access to the location where the illicit images were found.

It's important to keep in mind the State's duty to prove that Langston had either joint or exclusive control over each image. The situation is much like one more typically encountered by police—drugs found in a car with several occupants. If drugs are found in the center console, many facts might be relevant in deciding whether the driver, the front-seat passenger, or a back-seat passenger possessed the drugs. Was it the driver's car? Did one of the passengers often drive the car? Had anyone else driven the car recently? Was the console locked and, if so, who had access to the key? Questions like these could be relevant because simply being in possession of a car that contains drugs or having access to the drugs isn't enough to prove possession: there must be other evidence tying the defendant to the drugs to prove a criminal charge of drug possession. *State v. Rosa*, 304

Kan. 429, Syl. ¶ 3, 371 P.3d 915 (2016); *State v. Keel*, 302 Kan. 560, Syl. ¶ 2, 357 P.3d 251 (2015).

The situation here with Langston's computer is essentially the same. Under Langston's proffered evidence, many people had access to the place where the illicit images were found. We found one case similar to Langston's in the context of drug possession—*State v. Hedge*, 297 Conn. 621, 636-37, 646, 1 A.3d 1051 (2010), from the Supreme Court of Connecticut. In *Hedge*, the defendant had been stopped while driving his girlfriend's car, and officers found drugs in hidden panels in the car. The trial court excluded defendant's proffered evidence that the girlfriend had loaned the car for a significant time period (most of the week leading up to the defendant's arrest) to another man, a convicted drug dealer, including within 24 hours of the arrest. The Connecticut Supreme Court agreed with the defendant that the trial court had violated the defendant's constitutional right to present his defense: "[T]he trial court's exclusion of the . . . evidence deprived the defendant of the opportunity to present his version of the facts to the jury and to explain to the jurors who, if not him, committed the offenses . . . ." 297 Conn. at 637.

In Langston's case, the district court gave two reasons for excluding the testimony he offered about the access others had to these computers and Eker's potential role in placing the images there—the third-party witness rule and the timing of the defendant's identification of his trial witnesses. Neither provides a valid basis for exclusion.

The third-party-evidence rule is of limited scope and not applicable to most of the evidence at issue here. It comes into play when a defendant tries to prove that a third person—not the defendant—committed the offense the defendant is charged with. In that situation, the defendant isn't allowed to present evidence that the third person had some *motive* to commit the offense unless there is other evidence (beyond mere motive) connecting the third party to the crime. *State v. Marsh*, 278 Kan. 520, 530-31, 102 P.3d

445 (2004), *rev'd on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); see also *State v. Carr*, 300 Kan. 1, 199-203, 331 P.3d 544 (2014), *rev'd on other grounds by Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); *State v. Hopkins*, No. 110,581, 2015 WL 1310081, at \*7-9 (Kan. App. 2015) (unpublished opinion). Except for evidence related to Eker, the defense sought to present the testimony to increase the credibility of defendant's denial of knowledge that the images were on the computer hard drive at all, not to connect a specific third party to the crime. So the third-party-evidence rule wouldn't apply except potentially as to testimony about Eker.

As to Eker, the combination of the evidence Langston sought to present—not only that he had given the hard drive at one time to Eker but also that Eker had girls' toddler underwear and a child sex doll in his room—was intended to suggest Eker committed the offenses. Thus, the third-party evidence rule could be applied here, potentially to exclude the evidence. But in addition to evidence of motive (the materials found in Eker's room), there also was evidence connecting Eker to the computer hard drive on which the images were found. Like the evidence against Langston, the evidence against Eker is circumstantial. But in a case in which the State is presenting a circumstantial criminal case against Langston, the defendant's right to present a defense tips the balance in favor of allowing him to present a circumstantial case against another party—given that there is evidence here beyond mere motive. By connecting Eker to this computer and hard drive, the defense essentially put Eker at the crime scene. See *State v. Burnett*, 300 Kan. 419, 432-33, 329 P.3d 1169 (2014); *Hopkins*, 2015 WL 1310081, at \*7-9. See generally Schwartz and Metcalf, *Disfavored Treatment of Third-Party Guilt Evidence*, 2016 Wis. L. Rev. 337, 346-47, 397-98 (2016). We conclude that Langston's constitutional right to present his defense also required the admission of the Eker evidence.

The district court's ruling about the timing of the defendant's disclosure of witnesses is harder to pin down. In its brief on appeal, the State doesn't provide an

13

affirmative defense of the district court's timing ruling on its merits. Instead, the State argues that Langston hasn't shown that the timing ruling was in error; based on that, the State contends we should uphold the district court based on a failure in Langston's briefing on appeal.

In response, Langston argues that he discussed only the third-party evidence rule in his initial appellate brief because the State's timing argument in the district court was specifically tied to that rule. As Langston notes, the prosecutor told the district court that "'because they didn't tell us until Monday morning that they were going to be pleading this third party evidence . . . we've been completely deprived of any opportunity'" to rebut it. Since the State's timing argument to the district court was tied to the third-party evidence rule—and the defense squarely argued in its initial appellate brief that the third-party evidence rule didn't apply here—we agree that the defense has not waived the timing issue by a failure to brief it.

What's harder to figure out—notwithstanding that the prosecutor's timing argument to the district court was tied to the third-party-evidence rule—is what the actual basis was for the district court's ruling regarding timing. At one point, the district court appeared to tie its ruling to the cases regarding third-party evidence: "It's just ridiculous . . . that [the disclosure is] this late in time. Cases in Kansas are not like that and that's not what the cases [the prosecutor cited] hold." The cases cited by the prosecutor all related to the third-party-evidence rule, which didn't apply and doesn't have a specific time standard.

More generally, there is no Kansas statute requiring that criminal defendants identify all witnesses in advance of calling them at trial. See *State v.* Coleman, 253 Kan. 335, 347, 856 P.2d 121 (1993). The criminal-discovery statute, K.S.A. 2016 Supp. 22-3212, provides only that the defense provide certain disclosures of expected testimony from *expert* witnesses if the defense makes specified requests for disclosures by the

prosecution. See K.S.A. 2016 Supp. 22-3212(c). The statute also allows for other court orders, K.S.A. 2016 Supp. 22-3212(e), or agreements about disclosures by the parties, K.S.A. 2016 Supp. 22-3212(f), but the district court didn't mention any of these when it made its ruling. And while there is a statutorily required notice of alibi witnesses, K.S.A. 2016 Supp. 22-3218, most of the excluded evidence had nothing to do with an alibi (that Langston was somewhere else when the crime was committed)—it simply showed that others could have put the images on the computer.

The district court referenced a "discovery process [the] Wyandotte County District Attorney's office utilizes that when you ask for discovery, you indicate [your witnesses] what, within 10 days?" But the prosecutor immediately responded that Langston's attorney hadn't proceeded with a request to copy the State's file. Even so, the prosecutor said that pretrial disclosure by the defense was "still mandated by statute that we have to know within a reasonable time prior to [trial] if there's any discovery done under the statute, which there was." The only pretrial discovery we've noted in our record is that the defense obtained pretrial access, by court order, for its expert to examine the computer hard drive and images. But that would at most have triggered a requirement that the defense disclose its expert witness, see K.S.A. 2016 Supp. 22-3212(c), which apparently occurred.

In the defendant's reply brief, his attorney says that there was an agreed pretrial order for reciprocal discovery under which the defense did agree to provide a list of defense witnesses at least 10 days before the trial. If such an agreement was made, it's not in our record. But even if such an agreement existed and was placed in an enforceable court order, the district court still is not supposed to impose the most severe sanction— forbidding the calling of undisclosed defense witnesses—except as a last resort. Before entering such an order, the court must first consider a series of factors, known as "the *Bright* factors" after the first case to provide them, such as whether prejudice to the State can be avoided by a recess or delay in the trial. See *Coleman*, 253 Kan. at 347-51; *State v.*

15

*Bright*, 229 Kan. 185, 194, 623 P.2d 917 (1981). The last of the *Bright* factors counsels that the "trial court should . . . avoid imposing the severe sanction of prohibiting the calling of the witness if at all possible. This should be viewed as a last resort." 229 Kan. at 194.

The court did inquire at one point about the possibility of the State investigating these witnesses—but it did not consider a possible recess or delay of the trial. When the prosecutor responded that the detective who would normally handle any further investigation would be tied up testifying in court at trial, the court did not explore the possibility of a recess or trial delay. Instead, the court restated its view that the witness disclosures were "absolutely too late."

The State has not suggested—and our record does not show—that the district court either cited to or considered the *Bright* factors. So even if there was some enforceable requirement that the defense provide a witness list 10 days before trial, the district court's failure to consider the *Bright* factors and try to remedy the nondisclosure with some sanction short of prohibiting the testimony altogether would be an abuse of discretion. See *Coleman*, 253 Kan. at 351. We note too that at most, the defense was obligated to provide witness names, not the content of expected testimony.

In sum, the evidence at issue was quite significant to the defendant's case; the district court precluded it primarily on the basis that the defendant should have disclosed his witnesses long before trial; and the district court did not consider the *Bright* factors. Based on our review of the record, we conclude that the district court's rulings interfered with Langston's constitutional right to present his defense. We therefore reverse the defendant's convictions and remand the case for a new trial.

Although we are ordering a new trial based on our review of the first issue Langston raised on appeal, some of his other issues would be relevant to any retrial. We proceed to consider those issues.

II. *The District Court Did Not Err by Choosing Not to Instruct the Jury on the Defense of Ignorance or Mistake.*

Larson's next claim is that the district court should have given the jury an instruction about the defense of ignorance or mistake. What instructions should be given will arise again on remand, so we will address this issue.

While the attorneys were discussing jury instructions with the district court, the parties agreed that the State had to prove Langston acted with a culpable mental state in committing each act of sexual exploitation of a child. That made sense—in Kansas, a culpable mental state is an essential element of every crime unless a statute plainly provides otherwise. K.S.A. 2012 Supp. 21-5202(a), (d); see *State v. Heironimus*, 51 Kan. App. 2d 841, 850, 356 P.3d 427 (2015).

Much of the time, all the State must prove is the general intent to commit the conduct that constitutes the crime. See K.S.A. 2012 Supp. 21-5202(a), (e); *State v. Howard*, 51 Kan. App. 2d 28, 47, 339 P.3d 809 (2014), *aff'd* 305 Kan. 984, 389 P.3d 1280 (2017). To prove general intent, the State need only prove that the defendant acted intentionally in the sense that the defendant was aware of what he or she was doing. 51 Kan. App. 2d at 46. If the person knew what he or she was doing and those acts constitute a crime, the defendant has knowingly committed that crime—even if the defendant didn't intend to break the law.

The district court's instructions followed the State's suggestion that it need only prove general intent: "The State must prove that the defendant committed the crime

17

sexual exploitation of a child knowingly. A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about." The defense agreed to that instruction, and no issue about it has been raised in this appeal.

Langston then requested that the court instruct the jury on the defense of ignorance or mistake based on a pattern jury instruction. That instruction provides: "It is a defense in this case if by reason of ignorance or mistake the defendant did not have at the time the mental state which the statute requires as an element of the crime." PIK 4th Crim. 52.090. Langston argued that his ignorance that the images were on the computer at all meant that he couldn't have knowingly possessed them.

Langston preserved this issue for appellate review by requesting the instruction at trial, so we proceed to consider whether the instruction was legally appropriate. If so, we would then proceed to consider whether it was factually appropriate based on the evidence in this case. And if the instruction was both legally and factually appropriate— and thus should have been given but wasn't—we would then determine whether the error caused prejudice to Langston or was harmless. See *State v. Salary*, 301 Kan. 586, Syl. ¶ 1, 343 P.3d 1165 (2015).

We find no error because Langston's proposed instruction wasn't legally appropriate. The part of the offense that Langston was contesting was knowing possession of the images, something for which only general intent (knowing conduct) was required. If he possessed them, the State also had to show he did so with the intent to arouse or satisfy sexual desires or to appeal to prurient interests. See *State v. Zabrinas*, 271 Kan. 422, 439, 24 P.3d 77 (2001). The jury was properly instructed about that too, and the intended use of the images isn't what was at issue in Langston's proposed instruction.

18

So what would Langston's proposed instruction have added to the jury's consideration about whether he knowingly possessed the images? Nothing. The State had to prove he knowingly possessed the images; under the instruction the court gave, Langston had to be "aware of the nature of his conduct that the State complains about"—he had to know he possessed the images.

The defense of mistake of fact or ignorance is applicable when more than mere general intent (the defendant knew what physical actions he or she was taking) is at issue. For the crime of aggravated interference with parental custody, for example, a parent who took a child with her and didn't know that the child had been placed in state custody wouldn't have the specific intent required for that crime. Committing that crime requires that the defendant have the specific intent to detain or conceal a child from the lawful custodian. See *State v. Ortega*, 300 Kan. 761, 779-85, 335 P.3d 93 (2014). So in that case, the defendant must know not only the physical acts being taken (such as driving away with a child in tow) but also intend to interfere with the custody order. But the defense of mistake of fact or ignorance only applies in specific-intent crimes; it has no application to crimes like the ones Langston was charged with because—at least with respect to the possession element that Langston challenges here—only general intent had to be proved. See *State v. Diaz*, 44 Kan. App. 2d 870, 873-75, 241 P.3d 1018 (2010).

Even if we had concluded that the district court erred by failing to give the instruction, however, the error would have been harmless. If an error occurred, we assume it would have been a constitutional error since Langston argues that this instruction was necessary to the very presentation of his defense. Accordingly, for the error to be harmless, the State must show beyond a reasonable doubt that there is no possibility the error contributed to the verdict. *State v. Atkins*, 298 Kan. 592, 599, 315 P.3d 868 (2014). Even with this high burden, we find any error to have been harmless.

19

The court specifically instructed the jury that the State had to prove that Langston "possessed" the images. The court also instructed that possession meant having "joint or exclusive control over an item with knowledge of or intent to have such control" or "knowingly keeping some item in a place where the person has some measure of access and right of control." And the court instructed the jury that if it had any reasonable doubt as to the truth of any of the claims the State had to prove, the jury must find the defendant not guilty. The defendant's proposed instruction really added nothing. If "by reason of ignorance or mistake the defendant did not have . . . the mental state which the statute requires as an element of the crime," the instruction the defense wanted given, Langston wouldn't have known that the items were there.

As Langston's appellate lawyer puts his contention on appeal, "Here, Mr. Langston's defense was not to dispute the existence of the images; rather, he claimed ignorance of the possession." No one could dispute that the photos were on a computer to which Langston had access. Langston's defense was simple: he didn't know they were there. The court told the jury it had to find that Langston had control over the images "with knowledge of or intent to have such control" or that he "knowingly [kept them] in a place where [he had] some measure of access and right of control." In either case, the State had to prove Langston knew the images were there. We presume the jury followed those instructions, *State v. Kleypas*, 305 Kan. 224, 279, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017), and we find any error on this point to have been harmless beyond a reasonable doubt.

III. *Langston Has Not Shown That the Statute Prohibiting Sexual Exploitation of a Child Is Unconstitutional.*

Langston next argues that the statute making criminal exploitation of a child illegal, K.S.A. 2012 Supp. 21-5510(a)(2), is so broadly written that it criminalizes speech protected under the First Amendment to the United States Constitution. He specifically

20

complains that the statute reaches "virtual" child pornography, even images that might not have used an actual child in their creation.

Before we get to the substance of Langston's argument, we must consider whether he has standing, or the legal ability, to raise this issue. The State's evidence included the testimony of Corporal Thad Winkelman, who testified that none of the images appeared to have had their content digitally altered in any significant way. And a pediatrician, Dr. Terra Frazier, testified that all of the photos showed children under age 18. So Langston's claim that the statute reaches protected speech doesn't apply to his own case: he makes no claim that the State cannot outlaw sexually explicit photos of children.

Normally, a party can't raise a hypothetical issue that doesn't apply to that party. But when the claim is that a statute is so broad that it interferes with First Amendment free-speech rights, there is no absolute requirement that a person attacking a statute as overbroad be directly affected. See *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973); *State v. Williams*, 299 Kan. 911, 919, 329 P.3d 400 (2014). This exception allows a litigant to challenge the statute because an overbroad statute may cause others not before the court to refrain from constitutionally protected speech even if the litigant's own rights aren't violated. *Broadrick*, 413 U.S. at 612. We may proceed to consider his argument. *Williams*, 299 Kan. at 919.

To discuss Langston's specific arguments about why the statute is too broadly written, we need to review the statute's wording. The conduct prohibition applicable here covers visual depictions of a child engaged in sexually explicit conduct:

> "(a) Sexual exploitation of a child is:
>
> . . . .
>
> (2) possessing any visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual

21

desires or appeal to the prurient interest of the offender or any other person." K.S.A. 2012 Supp. 21-5510(a)(2).

The statute then provides two key definitions. Langston notes that the first, defining "sexually explicit conduct," covers both actual and simulated conduct:

> "'Sexually explicit conduct' means actual or simulated: Exhibition in the nude; sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex; masturbation; sado-masochistic abuse with the intent of sexual stimulation; or lewd exhibition of the genitals, female breasts or pubic area of any person. K.S.A. 2012 Supp. 21-5510(d)(1).

Langston also points to the inclusion of digitally or computer-generated images in the statute's definition of "visual depiction":

> "'[V]isual depiction' means any photograph, film, video picture, digital or computer-generated image or picture whether made or produced by electronic, mechanical or other means." K.S.A. 2012 Supp. 21-5510(d)(5).

Based on these statutory provisions, Langston contends the statute reaches out to conduct protected under the First Amendment in two ways. First, he argues that inclusion of computer-generated images "encompasses digitally created images that appear to be a minor child but are not digital images of a real minor child." Second, he argues that inclusion of simulated acts "may include images of children digitally altered so as to merely simulate nudity without any capturing of actual child nudity." Given these broad definitional sections, he argues that the statute outlaws constitutionally protected free speech under the United States Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). In *Ashcroft*, the Court struck down a federal statute that made illegal images that merely appeared to be of a minor engaging in sexually explicit conduct but actually didn't involve any child in their production. The Court held that the First Amendment offered no protection to

22

"pornography produced with real children," 535 U.S. at 246, but that this federal statute went too far when it regulated "virtual pornography" that was not legally obscene. 535 U.S. at 246, 256.

We need not spend our time considering Langston's first argument, that this Kansas statute prohibits digitally created images that aren't of a real child. The State contends that the statute only reaches the visual depiction of a real child, and that's a fair reading of the statutory language. The key prohibition in the statute talks of the "visual depiction *of a child*," not of someone who appears to be a child. And while the later definition of sexually explicit conduct allows for "actual or simulated" conduct, that doesn't suggest that a *simulated child* is covered. Given the ruling in *Ashcroft* and the preference for reasonable interpretations that avoid serious constitutional challenges to a statute, interpreting this statute to cover only depictions made using a real child is quite reasonable. See *State v. Ryce*, 303 Kan. 899, 906, 368 P.3d 342 (2016); *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

We turn then to Langston's argument that the statute's coverage of morphed images that look like children engaged in sexually explicit conduct covers protected speech. On this point, the State agrees that "non-sexualized images of real children that have been altered to make those real children look to be engaging in sexually explicit acts" are covered by the statute. The State argues that does not violate anyone's First Amendment rights, citing our court's decision in *State v. Coburn*, 38 Kan. App. 2d 1036, 1064-65, 176 P.3d 203 (2008), which concluded that this Kansas statute could constitutionally prohibit images made using real children and then altered to simulate sexually explicit conduct.

In *Coburn*, our court noted that the *Ashcroft* opinion had specifically declined to address the constitutionality of innocent photographs taken of real children that were

23

altered so that the children appeared to be engaged in sexual activity. 38 Kan. App. 2d at 1064 (citing *Ashcroft*, 535 U.S. at 242). But our court noted that even without addressing the constitutionality of a prohibition of such images, the *Ashcroft* Court said that images like that "did 'implicate the interests of real children and are in that sense closer to the images'" of child pornography it had found a state could prohibit in *New York v. Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). 38 Kan. App. 2d at 1064. Our court concluded that the State's interest in protecting children sufficiently outweighed any free-speech interests and upheld application of the Kansas child-exploitation statute to photos of real children that were altered to make the children appear to be engaging in sexually explicit conduct (and meeting the other statutory requirements). 38 Kan. App. 2d at 1064-65.

Langston argues that *Coburn* was wrongly decided and asks us to reject its holding. That claim is not a trivial one. A reasonable argument can be made that a statute that goes beyond the prohibition of images created by harming children through sexual exploitation or abuse to a prohibition of initially innocent images in which the children weren't harmed in making the images does infringe on constitutionally protected speech. See Hessick, *The Limits of Child Pornography*, 89 Ind. L.J. 1437 (2014).

To address the argument Langston has made here, though, we need not make that call. While Langston does have standing to challenge this statute on overbreadth grounds, to succeed he must show that (1) the protected activity is a significant part of the conduct the law has targeted and (2) there's no satisfactory method to sever the law's constitutional applications from its unconstitutional ones. *Dissmeyer v. State*, 292 Kan. 37, 40-41, 249 P.3d 444 (2011); see *United States v. Williams*, 553 U.S. 285, 303, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008); *Ashcroft*, 535 U.S. at 244.

24

Our case is unlike *Ashcroft*, where the Court noted that the statute at issue could have reached Renaissance paintings and Oscar-winning movies and the material was banned even if it did not appeal to prurient interests. 535 U.S. at 246-49. In those circumstances, the Court concluded that the statute was unconstitutionally overbroad because it "abridge[d] the freedom to engage in a substantial amount of lawful speech." 535 U.S. at 256.

Langston has not shown that the sort of situation found in *Ashcroft*, where the law targeted substantial areas of protected speech, is found here. As the *Ashcroft* Court noted, "If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution for abusing real children if fictional, computerized images would suffice." 535 U.S. at 254. Yet the significant market appears to be images made through the abuse of children, not nonsexualized images of real kids that have been morphed to make them look sexually explicit.

On the record before us, Langston has not shown that a significant part of the targeted conduct is protected under the First Amendment. Accordingly, he has not shown that the statute is unconstitutionally overbroad such that it cannot be enforced.

IV. *The Search Warrant Used to Search Langston's Residence Was Valid*.

In a supplemental brief, Langston argues that the search warrant for his residence was invalid. First, he argues that it didn't describe the place to be searched with sufficient particularity. The warrant had called for a search of apartment B1, while Langston lived in apartment B2. Based on the officers' briefing before the search, though, they searched the intended apartment, B2, not the one mistakenly listed in the warrant. Second, Langston argues that the affidavit supporting the warrant wasn't sufficient to give probable cause to search his apartment.

As for the mix-up on the apartment number, an inaccuracy in the address to be searched doesn't necessarily invalidate a search warrant. The Nebraska Supreme Court upheld the warrant in a similar case in which the wrong apartment number was given but other information provided to the officer allowed the officer to find the correct place for the search. *State v. Walters*, 230 Neb. 539, 546-48, 432 N.W.2d 528 (1988). Similarly, the Washington Court of Appeals upheld a warrant when the officer who executed it had sufficient knowledge of the location to be searched to cure the address mistake found in the warrant. *State v. Bohan*, 72 Wash. App. 335, 339, 864 P.2d 26 (1993). Accord *United States v. Gamboa*, 439 F.3d 796, 806 (8th Cir. 2006).

In our case, Detective Jackie Lynn filed an affidavit in support of the warrant. She said he lived in apartment B1 instead of B2, but she also said that the apartment was accessed from the south side of the building and had the only door on the south side, lower level of the building. The officers executing the warrant were briefed based on surveillance from other officers that the apartment to be searched was on the south side of the building and to the left if one was facing the back of the building. When police carried out the warrant, they searched the correct residence, apartment B2, Langston's residence.

The Fourth Amendment does require that search warrants particularly describe the place to be searched. Our Supreme Court has held, consistent with the cases we've already noted, that for a warrant for a multiple-occupancy building, "a slight omission or inaccuracy" doesn't invalidate a warrant "where the description of the subunit is sufficient to enable the executing officer to locate the premises with reasonable certainty." *State v. Gordon*, 221 Kan. 253, 259, 559 P.2d 312 (1977). The officers executing the warrant in this case had sufficient information to get the right unit with reasonable certainty even though the apartment number was incorrect. The warrant should not be held invalid on the basis that it didn't sufficiently describe the premises to be searched.

Langston's other argument about the warrant's validity posits that police couldn't properly rely upon an informant who provided some of the information because she was unreliable. Langston didn't make this argument before the district court, and we can't consider it for the first time on appeal. See *State v. Cox*, 51 Kan. App. 2d 596, 603, 352 P.3d 580 (2015). When a defendant wants to challenge the probable-cause basis for an affidavit, and especially when he seeks to do so with a claim that some information (here, going to the reliability of the informant) was omitted, the proper course is to ask for a hearing in the district court, where the court can take evidence, if necessary, on the matter. See *State v. Mell*, 39 Kan. App. 2d 471, 487-88, 182 P.3d 1 (2008). We decline to consider this issue when raised for the first time on appeal.

V. *Because a New Trial Is Ordered, No Other Issue Requires Our Review.*

In addition to the issues we have discussed so far, Langston also raises a claim that the prosecutor made improper statements in closing argument and that an aspect of his sentencing was unlawful.

As for the prosecutor's comments, one related to the possibility that some of the photos had been digitally manipulated. The comments seem consistent with our court's holding in *Coburn*, and the State has emphasized in its appellate brief that the photos must show a real child under age 18 to fit under this statute. Accordingly, it seems unlikely that the prosecutor's comment at any retrial on this topic would be outside the bounds of fair argument. The other comment related to evidence about what the anonymous tipster had said about one of the images possibly being of Langston's daughter. The parties had agreed that the State wouldn't present that information, but defense counsel brought it out when cross-examining Detective Lynn. If the defense puts the matter in evidence, it's proper to place that evidence in context during closing

27

argument. But the defense may choose to avoid it on retrial, so we have no reason to believe the issue will arise again in closing argument.

As for sentencing, Langston argues that his sentence should have included only 24 months of postrelease supervision, not lifetime supervision. That issue obviously won't arise again unless Langston is again convicted on retrial. Our court has rejected the argument Langston is making in several cases. E.g., *State v. Herrmann*, 53 Kan. App. 2d 147, 153-54, 384 P.3d 1019 (2016), *rev. denied* 306 Kan. ___ (July 25, 2017); *State v. Phillips*, No. 115,107, 2017 WL 1822383, at *1 (Kan. App. 2017) (unpublished opinion), *petition for review filed* June 5, 2017; *State v. Younkman*, No. 115,606, 2017 WL 1035473, at *2-4 (Kan. App. (2017) (unpublished opinion), *rev. denied* 306 Kan. ___ (August 31, 2017). Since some of our rulings on this point remain under review and the Kansas Supreme Court has not yet addressed the issue, we will address it in Langston's case only if it arises again after his retrial.

The district court's judgment is reversed; this case is remanded for further proceedings consistent with our opinion.